John E. Lord (SBN 216111)
SKIERMONT DERBY LLP
633 W. Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213)788-4545
jlord@skiermontderby.com

Paul J. Skiermont (*pro hac vice*)
(TX Bar No. 24033073)
Jaime K. Olin (SBN 243139)
Ryan A. Hargrave (*pro hac vice*)
(TX Bar No. 24071516)
Alexander E. Gasser (*pro hac vice*)
(WI Bar 1022659)
SKIERMONT DERBY LLP
1601 Elm Street, Suite 5800
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
jolin@skiermontderby.com
rhargrave@skiermontderby.com
agasser@skiermontderby.com

*Attorneys for Plaintiff*
ENTANGLED MEDIA, LLC

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| ENTANGLED MEDIA, LLC, | C.A. No. 5:23-cv-03264-PCP-VKD |
| Plaintiff, | **PLAINTIFF ENTANGLED MEDIA, LLC'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| DROPBOX, INC., | Judge: Hon. P. Casey Pitts |
| Defendant. | Courtroom: 8 – 4th Floor<br>Hearing Date: May 8, 2025<br>Hearing Time: 10:00 a.m. |

**TABLE OF CONTENTS**

NOTICE OF MOTION ................................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 2

I.  INTRODUCTION AND STATEMENT OF ISSUES.......................................................... 2

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS.................................................... 3

III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO
DROPBOX'S DEFENSE AND COUNTERCLAIMS BASED ON
INEQUITABLE CONDUCT AND IMPROPER INVENTORSHIP ............................. 10

   1.  Legal Standard for Summary Judgment................................................... 10

   2.  Legal Standard for Determining Inventorship .......................................... 10

   3.  Matt Drew Is Not a Co-Inventor on the Asserted Patents........................... 11

      A.  Matt Drew's Alleged Contributions Went to the Implementations/
Reductions to Practice of Certain Ideas Rather Than Conception of Those
Ideas ............................................................................................... 11

      B.  Matt Drew's Contributions Relate to Reducing to Practice Ideas Already
Conceived by Erik Caso Before Matt Drew Started Work at Entangled
Media ............................................................................................... 13

      C.  Matt Drew's Testimony as to His Contributions Lack Sufficient
Corroboration ................................................................................... 13

      D.  Any Incorrect Recitation of Inventors Can Be Administratively Corrected
via this Court and the U.S. Patent Office Without Invalidating Any Patents ........ 14

   4.  Legal Standard for Determining Inequitable Conduct .................................. 14

   5.  As a Matter of Law, Dropbox Cannot Show Inequitable Conduct ............................. 16

      A.  The Inventor Declarations Are Not False .................................................. 16

      B.  The Allegedly False Inventor Declarations Are Not Material ............................... 17

      C.  Dropbox Cannot Show the Required Specific Intent to Deceive........................... 17

IV.  THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT OF NO
INVALIDITY OVER THE FOLDERSHARE REFERENCE. ....................................... 18

   1.  Dropbox Misconstrues the FolderShare Reference....................................... 18

   2.  Dropbox Provides No Evidence of "Reasonable Expectation of Success" to
Support the FolderShare Combinations .................................................. 20

V.    ENTANGLED MEDIA IS ENTITLED TO SUMMARY JUDGMENT ON DROPBOX'S TENTH, ELEVENTH, AND SIXTEENTH AFFIRMATIVE DEFENSES ........................................................................................................ 21

VI.   THE COURT SHOULD GRANT SUMMARY JUDGMENT OF PATENT ELIGIBILTY UNDER 35 U.S.C. §101. ........................................................................... 22

VII.  CONCLUSION ..................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Acromed Corp. v. Sofamor Danek Grp., Inc.*,
  253 F.3d 1371 (Fed. Cir. 2001) ................................................................................................ 10

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................................. 10

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017) ................................................................................................ 20

*Asetek Danmark A/S v. CooIT Systems, Inc*,
  Case No. 19-cv-00410-EMC (N.D. Cal. Sept. 11, 2022) .......................................................... 20

*Astrazeneca Pharms. LP v. Teva Pharms. USA, Inc.*,
  583 F.3d 766 (Fed. Cir. 2009) .................................................................................................. 18

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ................................................................................................ 23

*Contour IP Holding LLC v. GoPro, Inc.*,
  113 F.4th 1373 (Fed. Cir. 2024) ............................................................................................... 22

*Crown Packaging Tech. v. Rexam Beverage Can Co.*,
  559 F.3d. 1308 (Fed. Cir. 2009) ............................................................................................... 21

*Ethicon, Inc. v. United States Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998) .......................................................................................... 11, 13

*Gart v. Logitech, Inc.*,
  254 F.3d 1334 (Fed. Cir. 2001) ................................................................................................ 21

*GFI, Inc. v. Franklin Corp.*,
  265 F.3d 1268 (Fed. Cir. 2001) ................................................................................................ 15

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012) ................................................................................................ 20

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000) ................................................................................................ 19

*In re Stepan Co.*,
  868 F.3d 1342 (Fed. Cir. 2017) ................................................................................................ 19

*In re Warsaw Orthopedic, Inc.*,
  832 F.3d 1327 (Fed. Cir. 2016) ................................................................................................ 19

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
  863 F.2d 867 (Fed. Cir. 1988) ............................................................................................ 15, 18

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................................................................. 19

*MobileMedia Ideas LLC v. Apple Inc.,*
  780 F.3d 1159 (Fed. Cir. 2015) ........................................................................... 20

*Molins PLC v. Textron, Inc.,*
  48 F.3d 1172 (Fed. Cir. 1995) ............................................................................. 15

*Murdock Webbing Co. v. Dalloz Safety, Inc.,*
  213 F. Supp. 2d 95 (D.R.I. 2002) ........................................................................ 11

*OSI Pharms., LLC v. Apotex Inc.,*
  939 F.3d 1375 (Fed. Cir. 2019) ........................................................................... 20

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.,*
  695 F.3d 1285 (Fed. Cir. 2012) ........................................................................... 17

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.,*
  225 F.3d 1315 (Fed. Cir. 2000) ........................................................................... 17

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.,*
  566 F.3d 989 (Fed. Cir. 2009) ............................................................................. 20

*Sewall v. Walters,*
  21 F.3d 411 (Fed. Cir. 1994) ............................................................................... 10

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.,*
  127 F.3d 1462 (Fed. Cir. 1997) ...................................................................... 21, 22

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.,*
  537 F.3d 1357 (Fed. Cir. 2008) ........................................................................... 15

*Therasense, Inc. v. Becton, Dickinson & Co.,*
  649 F.3d 1276 (Fed. Cir. 2011) ..................................................................... passim

**Statutes**

35 U.S.C. § 101 ...................................................................................................... 22

35 U.S.C. § 256 ...................................................................................................... 14

35 U.S.C. § 256 (b) ................................................................................................ 14

35 U.S.C. § 287 .................................................................................................. 1, 21

35 U.S.C. §101 ........................................................................................................ 1

35 U.S.C. §286 ........................................................................................................ 1

**Rules**

Fed. R. Civ. P. 56 .................................................................................................... 1

Fed. R. Civ. P. 56(a) .............................................................................................. 10

**Regulations**

37 C.F.R. § 1.48 ..................................................................................................... 14

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS:

NOTICE IS HEREBY GIVEN that on May 8, 2025, at 9:00 AM, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable P. Casey Pitts, located at 280 South 1st Street, Courtroom 8, Fourth Floor San Jose, California, 95113, Plaintiff Entangled Media LLC will and hereby does move the Court for an Order of summary judgment pursuant to Fed. R. Civ. P. 56 as to certain affirmative defenses and counterclaims asserted by Defendant Dropbox, Inc.

Entangled Media moves for summary judgment in its favor with respect to (1) Defendant's 17th Affirmative Defense (Inequitable Conduct) and Defendant's Counterclaims V and VI (Declaratory Judgment of Unenforceability Due to Inequitable Conduct, and Declaratory Judgment of Unenforceability for Failure to Name Correct Inventors); (2) Defendant's Third and Seventh Affirmative Defenses (Invalidity) based on the Folder Share prior art reference; (3) Defendant's Tenth Affirmative Defense (Limitations on damages and costs – 35 U.S.C. §286); (4) Defendant's Eleventh Affirmative Defenses (35 U.S.C. § 287); (5) Defendant's Sixteenth Affirmative Defense (Lack of Standing); and (6) patent eligibility under 35 U.S.C. §101.

This Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the Declarations of Alex Gasser and Erik Caso, filed herewith, the pleadings and papers on file herein, and any other evidence and argument presented to the Court at or before the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION AND STATEMENT OF ISSUES**

Dropbox has been knowingly infringing Entangled Media's Asserted Patents since learning about them no later than March 2017. To escape liability, Dropbox asserts a flurry of affirmative defenses and counterclaims.

Dropbox has brought two defenses/counterclaims for inequitable conduct and improper inventorship based on the allegation that Matt Drew, an Entangled Media employee who worked for the company for approximately six months in 2009, should have been named as an inventor of the Asserted Patents. And even though no one—including Mr. Drew—ever claimed that Mr. Drew conceived of any inventive aspect of any claim, Dropbox goes further: it accuses the named Entangled Media inventors of knowing that Mr. Drew was an inventor, hiding this from the Patent Office, and lying in their Patent Office submissions.

These grave allegations require proof by clear and convincing evidence. Yet, with discovery now complete, Dropbox has not identified *any evidence* that Mr. Drew conceived of any element claimed in the Asserted Patents or communicated any inventive contribution to the named inventors. Further, Mr. Drew's employment agreements contractually obligated him to assign to Entangled Media any inventions conceived or developed in connection with this employment, obviating any motive by Entangled Media to remove Mr. Drew as an inventor. This absence of evidence supporting *the* crucial element of proof is fatal to Dropbox's claims. Entangled Media therefore respectfully moves for summary judgment as Dropbox cannot present a fact issue sufficient to bring these defenses to a jury.

As to invalidity, to support four of its numerous obviousness combinations, Dropbox relies on the FolderShare reference and tries to interweave eighteen separate publications spanning four years as though they concern a single prior art system. This faulty premise dooms the invalidity analysis as it relates to FolderShare. FolderShare also fails because Dropbox has provided no evidence of reasonable expectation of success to support its obviousness combinations.

Entangled Media also seeks summary judgment as to Dropbox's §101 invalidity defense as the Court has already ruled as a matter of law on this issue, as well as Dropbox's defenses based on Section 286, 287, and lack of standing which are defenses that do not appear to be in dispute.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Entangled Media LLC was formed around May 2009 by its CEO Mr. Erik Caso. Ex. 18, 166:15-24; 167:14-17.[1]

2.  Prior to working with Entangled Media, Mr. Caso had experience leading other technology companies. Business plan materials from Entangled Media in May 2009 explained:

> "Erik brings over 12 years of technology development, executive management and entrepreneurial leadership to guide youniti. He was the co-founder and President of NT Objectives, a leading provider of web application security software. He has also held product strategy and business leadership roles at Foundstone (acquired by McAfee), Epoch lnternet (acquired by MegaPath), The Boeing Company and others." Ex. 19, EM_00029175.

3.  Prior to forming Entangled Media LLC, Mr. Caso began collaborating on a product called Younity (formerly known as youniti) with Mike Abraham, who was recruited and formally brought on to run engineering and become Chief Technology Officer (CTO) of Entangled Media in March 2009. Caso Decl., ¶ 11; Ex. 20, 52:15-53:8.

4.  Mr. Abraham at the time was an experienced software designer and the director of the applications product group for a software consulting group called J2 Interactive. Ex. 20, 55:2-10.

5.  Business plan materials from Entangled Media in May 2009 explained Mike Abraham's work experience as follows:

> Mike brings 20 years of experience to lead youniti's research and development efforts. He joins the company from Rogue Wave Software, where he was head of architecture and responsible for the company's creation of advanced, multi-platform code libraries and integrated development tools, used by large companies to deploy advanced web-based and desktop applications in multiple markets globally. Prior to Rogue Wave, Mike was head of engineering at Looking Glass Systems, a pioneer and leader in advanced endpoint security and risk management software used by governments and large corporations worldwide.

---

[1] Exhibit Nos. 1-17 are attached to the accompanying declaration of Erik Caso ("Caso Decl."). Exhibit Nos. 18-33 are attached to the accompanying declaration of Alex Gasser ("Gasser Decl.").

> Mike was Senior Architect at Jabber, an early leader in instant messaging software (recently acquired by Cisco), where he designed and led development of the cross-platform software and its UI. Before Jabber, Mike was Director of Analysis Products at Lucent Technologies/Bell Labs, where he led multiple teams of engineers in the design and development of several market leading technologies in the web and database analysis markets. Mike is considered a subject-matter expert in advanced peer-to-peer architectures, messaging systems and multi-platform technologies.

Ex. 19, EM_00029176.

6. On March 3, 2009, Erik Caso began discussions with Matt Drew regarding potential consulting work and Mr. Caso transmitted to Matt Drew an email forwarding an NDA. Caso Decl., ¶ 3; Exs. 1, 2. Matt Drew signed this NDA. Ex. 21, 23:16-21.

7. After Matt Drew signed the NDA, he and Erik Caso met later that day on March 3, 2009, and had a more detailed conversation regarding his potential consulting work. Caso Decl., ¶ 4.

8. Matt Drew never communicated to Erik Caso—either during or prior to this March 3 meeting—any ideas reflected in what would become Entangled Media's Younity product or the subject matter claimed in Entangled Media's U.S. Patent Nos. 8,296,338 and 8,484,260 ("The Asserted Patents") or the U.S. provisional patent application no. 61/175,489 ("Provisional Patent Application"). Caso Decl., ¶ 5.

9. Matt Drew began working for Entangled Media after March 4, 2009, at which time Mr. Caso forwarded to Matt Drew an initial consulting agreement on March 4, 2009, and then a replacement agreement on March 6. Caso Decl., ¶ 6; Exs. 3-6. Mr. Drew would not have commenced work at Entangled Media without signing the consulting agreement. *Id.*, ¶ 6.

10. On March 7, 2009, Mr. Caso set up Matt Drew's Entangled Media email account. Caso Decl., ¶ 7; Ex. 7.

11. On March 7, 2009, Mr. Caso transmitted to Matt Drew an email with the subject line "Concept Diagram," which contained the attachment "Concept_Diagram.pdf." Caso Decl., ¶ 8; Exs. 8-9. The contents of this email and its attachment were created by Erik Caso. Matt Drew had not seen this email and attachment prior to Mr. Caso transmitting it to him, and Matt Drew did not contribute in any way

to the substance of the information reflected in the email and its attachment. *Id.* Metadata confirms the cover email/attachment relationship of Exhibits 8 & 9, and that Mr. Caso authored the "Concept Diagram." Ex. 22, Gasser Decl., ¶¶ 6 & 7.

12. The Concept Diagram sent by Mr. Caso to Matt Drew on March 7, 2009, is substantially similar, if not identical, to a diagram included in the Provisional Application. Ex. 23. The two diagrams are shown side-by-side below, with the March 7, 2009 Concept Diagram on the left and the similar diagram from the Provisional Application on the right:

 

13. On March 9, 2009, Mr. Caso transmitted to Matt Drew a further email with the subject line "High level specification," containing the following attachment "Specification_&_Architecture_030909.doc." Caso Decl., ¶ 10; Exs. 11-12. Matt Drew had not seen this email and attachment prior to Mr. Caso transmitting it to him, and Matt Drew did not contribute in any way to the substance of the information reflected in the email and its attachment at Exhibits 11 and 12 prior to Mr. Caso forwarding this information to Matt Drew. *Id.* Metadata confirms the cover email/attachment

relationship of Exhibits 11 & 12, and that Mr. Caso authored the attachment "Specification_&_ Architecture_030909.doc." Ex. 22, Gasser Decl., ¶¶ 6 & 7.

14. The Technical Specification transmitted to Matt Drew on March 9, 2009, included the following "Use-Case Scenario":

> **Use-Case Scenario**
> 1. A user goes to the web and registers a MetaSync account.
>    a. Inputs user related information (name, email, etc.)
>    b. User selects the types of files they want available to them:
>       i. Pictures
>       ii. Video
>       iii. Audio/music
>       iv. Documents
>       v. User selects where downloaded files will be stored locally
> 2. User downloads the client web application, which runs like a desktop application, onto each device they have
>    a. Download is similar to downloading Google Maps application for a mobile phone
>    b. Client application collects an inventory of relevant files that the user has selected
>    c. Inventory of files is converted to a meta-index of all files
>    d. The meta-index is uploaded to the web application where it is merged with other device's meta-index to create a master index
>    e. The master index is pushed to all devices
>    f. As new files are added to each device, the master index is updated and reflected on all devices
> 3. User is now able to view files on all devices and initiate a P2P transfer of one or more on-demand
>    a. User can purchase media online while using one device and instantly have it available on all their other devices
>    b. User can retrieve any file on a remote device to their current device

15. The Technical Specification also describes a User Interface (UI) that includes icons:

> - UI for viewing Master Index
>   o Use of icons/color indicates local vs remote files
>   o Files view button, sorts view by:
>      ▪ File type
>      ▪ Location
>      ▪ Directory structure
>   o Select single or multiple files to queue for transfer
>      ▪ Icon to add to transfer queue
>      ▪ Icon to drop open (and also close) a folder to show directory contents to be selected (e.g. an album directory opened to pick individual songs instead of the whole directory)

Ex. 12, EM_00238406.

16. This March 9, 2009 Technical Specification overlaps with portions of the Provisional Patent Application. *See* Exs. 12 and 23.

17. Younity's feature set, processes, and architecture primarily originated as Erik Caso's idea, and when he began working with Mike Abraham, Mr. Abraham became Mr. Caso's collaborator to, among

other things, work through what they wanted Younity to do, what they believed their intellectual property would be, product architecture, and product feature set. Ex. 18, 169:14-23.

18. Erik Caso and Mike Abraham started collaborating at least as early as March 2009 on the nature of the Entangled Media company, the product the company would offer, and that product's design and architecture. Caso Decl., ¶ 12. Ex. 18, 164:19-165:19; 169:14-23.

19. Mike Abraham worked with others, such as Matt Drew, "to direct and implement what it was that [Erik Caso and Mike Abraham] were collaborating around in order to turn it into a software product." Ex. 18, 164:19-165:19. Although Matt Drew worked remotely, Mike Abraham and Erik Caso would occasionally meet Matt Drew in person. For example, the three of them met for lunch on March 24, 2009. Caso Decl., ¶ 12; Ex. 13.

20. Erik Caso and Mike Abraham together drafted the Provisional Patent Application (the first patent application they ever drafted) without the benefit of counsel, since Entangled Media at the time was not capitalized and therefore did not have funds to pay for patent prosecuting attorneys. Ex. 18, 172:11-174:2. Matt Drew played no role in drafting the Provisional Application. *Id.*, 173:25-174:3.

21. Because of Entangled Media's lack of funding at the time, Erik Caso received only general legal advice on procedural aspects of filing the Provisional Application, rather than substantive legal advice on the content of the Provisional Application. Without receiving any clear legal guidance on the topic of inventorship, and having no prior experience himself with filing patent applications, Erik Caso opted to err on the side of being overinclusive, and included Matt Drew as a listed inventor on the Provisional Application. Ex. 18, 172:11-173:11, 175:22-177:12.

22. On August 28, 2009, Mr. Caso terminated Matt Drew because the company was not using his code, and Mr. Drew had other obligations that prevented him from meaningfully contributing to the company's success. Caso Decl., ¶ 13. Mr. Caso forwarded to Matt Drew an email with an attached termination agreement, providing "formal notification of the termination of Entangled Media's Consulting Agreement" with Matt Drew. Caso Decl., ¶ 13; Exs. 14-15. This termination agreement included an intellectual property assignment to Entangled Media for all services performed by Matt Drew pursuant to Matt Drew's agreements with Entangled Media. Caso Decl., Ex. 15.

23. Between the filing of the Provisional Application on May 5, 2009 and the filing of the non-provisional patent application on May 5, 2010 (leading to the '338 Patent), Entangled Media obtained capital funding and was able to retain patent counsel to advise on the preparation and prosecution of Asserted Patents. At that time, Messrs. Caso and Abraham filed a Declaration with the USPTO stating their belief that they were the original, first and sole inventors:

> I believe I am the original, first and sole inventor (if only one name is listed below), or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

Ex. 24, EM_00000045.

24. On April 7, 2010, Erik Caso forwarded information regarding the Provisional Application to his patent prosecution attorney, reflecting Mr. Caso's belief at the time of this email thread that Matt Drew's contributions were not used by Entangled Media, and similarly were not used or reflected in the subject-matter claimed in the Asserted Patents. Caso Decl., ¶ 15; Ex. 17.

25. On or prior to July 14, 2010, Matt Drew received and then signed a Stock Purchase Agreement, dated July 14, 2010. Caso Decl., ¶ 14; Ex. 16. This Stock Purchase Agreement assigns any intellectual property rights relating to Entangled Media's business plan from Matt Drew to Entangled Media. Caso Decl., Ex. 16, EM_00114515.

26. Matt Drew testified in this litigation that he has no opinion on whether he should have been a listed inventor on either of the Asserted Patents or the Provisional Application. Ex. 21, 162:24-163:14.

27. With respect to any idea relevant to the subject matter in the Provisional Application or claimed in the Asserted Patents, Matt Drew testified that he never (i) claimed ownership of any such idea, (ii) claimed that any such idea originated with Matt Drew, or (iii) claimed that he conceived of any such idea. *See generally* Ex. 21. Rather, anytime Mr. Drew attributed ownership of an idea, such ownership was attributed to Erik Caso, rather than Mr. Drew. Ex. 21, 62:3-11; 111:23-112:4; *see also*, Ex. 18, 183:19-24. ("Well, I don't want to confuse anyone at the company having no contribution to what a company does. But in terms of the drafting of the idea, the application, you know, things like that, it was simply not something that we were working with Mr. Drew when we were producing it.").

28. Matt Drew answered in the affirmative that he "contributed" to various "ideas" linked to a specific claim limitation from the Asserted Patents; however, when elaborating on such "contributions," he confirmed this involved participating in discussions or working on coding for such topics. Ex. 21, 108-14-21, 114:12-18.

29. Matt Drew reportedly worked on a "file directory that was remotely stored on Amazon that was accessible --- from other places and then working on … shortcuts on your desktop that would launch that file from Amazon," and such file directory would allow a user to "register" a file that the user wants to "make available to all my devices" with the user's account in Amazon. *Id.,* 25:19-26:17, 26:22-28:2.

30. Each of the ideas recited in the above two paragraphs to which Matt Drew purportedly "contributed," or worked on were already provided to Matt Drew via Mr. Caso's emails and attachments dated March 7, 2009 and March 9, 2009, just days within Matt Drew signing a consulting agreement with Entangled Media. *See* Caso Decl., ¶¶ 8, 9; Exs. 8, 9, 11, 12.

31. Throughout Matt Drew's time working at Entangled Media, he was specifically directed or assigned by Mike Abraham and/or Erik Caso as to what code he should write. Ex. 18, 164:19-165:19; Ex. 20, 126:10-12, Ex. 21, 62:3-11.

32. Years later, in March 2017, over the course of several discussions (including in person meetings, phone calls, and emails), Mr. Caso disclosed the Asserted Patents to Morgan Kyauk, a senior executive on the Dropbox corporate development team, with accompanying technical documents that were marked with each of the patent numbers. Ex. 25; Ex. 26.

33. Mr. Caso communicated with Mr. Kyauk during these conversations that Entangled Media is seeking a license from Dropbox to practice its technology. Ex. 18, 205:19-206:5, 209:8-21. The technical documents, as well as Mr. Caso's communications, identified that Dropbox's Smart Sync functionality would infringe Dropbox's patents.

34. After Entangled Media disclosed the Asserted Patents to Mr. Kyauk, Mr. Kyauk stated among other things that he wanted to "chat with our team on this and get back to you" and that he "had a chance to connect with our team." Ex. 27.

III.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO DROPBOX'S DEFENSE AND COUNTERCLAIMS BASED ON INEQUITABLE CONDUCT AND IMPROPER INVENTORSHIP**

1.    **Legal Standard for Summary Judgment**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is genuine if the evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of identifying those portions of the evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. *See Anderson, 477 U.S. at 250*. The nonmoving party does this by citing to specific parts of the materials in the record or by showing that the materials cited by the moving party do not compel a judgment in the moving party's favor. FED. R. CIV. P. 56(c). A triable dispute of material fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. *See Anderson, 477 U.S. at 249*. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.

2.    **Legal Standard for Determining Inventorship**

Conception and inventorship are questions of law that rest on underlying facts. *Sewall v. Walters,* 21 F.3d 411, 415 (Fed. Cir. 1994). "Conception is the touchstone of inventorship." *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001). Conception is complete "when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." *Sewall*, 21 F.3d at 415.

"If an inventor seeks the input or advice of another in reducing an invention to practice such input or advice does not automatically rise to the level of joint inventorship. . . . The analysis turns on whether that contribution contains the necessary element of 'conception' and thereby rises beyond the simple reduction to practice of the inventor's previously conceived idea." *Murdock Webbing*

*Co. v. Dalloz Safety, Inc.*, 213 F. Supp. 2d 95, 100 (D.R.I. 2002). One "who simply reduce[s] the inventor's idea to practice does not qualify as a joint inventor…." *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998); *see also* MPEP § 2109 (9th ed. Rev. Feb. 2023) ("Insofar as defining an inventor is concerned, reduction to practice*, per se*, is irrelevant.").

"To show co-inventorship, however, the alleged co-inventor or co-inventors must prove their contribution to the conception of the claims by clear and convincing evidence. However, 'an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof.' The rule is the same for an alleged co-inventor's testimony. Thus, an alleged co-inventor must supply evidence to corroborate his testimony. Whether the inventor's testimony has been sufficiently corroborated is evaluated under a 'rule of reason' analysis. Under this analysis, '[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the [alleged] inventor's story may be reached.'" *Ethicon,* 135 F.3d at 1461 (citations omitted). "Corroborating evidence may take many forms. Often contemporaneous documents prepared by a putative inventor serve to corroborate an inventor's testimony." *Id.*

### 3.    Matt Drew Is Not a Co-Inventor on the Asserted Patents

As set forth below, testimony and evidence from Erik Caso and Mike Abraham, and even Matt Drew, overwhelmingly establish that Mr. Drew was not a co-inventor of the claimed subject-matter of the Asserted Patents.[2]

### A.    Matt Drew's Alleged Contributions Went to the Implementations/ Reductions to Practice of Certain Ideas Rather Than Conception of Those Ideas

Mr. Drew was asked multiple times in his deposition if he "contributed" to different "ideas," but was never asked if he contributed to the *conception* of the stated "idea," as indicated in the following two examples immediately below.

Q. Did you contribute anything to the idea of the software client installing itself and registering the local device's data with the web service?

---

[2] Citations to undisputed material fact numbers herein will be referred to as "UMF."

A. I am sure there were discussions about it and I'm sure I was involved. I have no recollection.

Ex. 21, 89:10-17.

Q. Did you contribute to the idea of creating a meta index of all data files?

A. Yes.

*Id.*, 107:24-108:1.

When asked more specifically what his actual contribution was, Mr. Drew's answers confirmed his work consisted of coding or participating in discussions regarding the recited "ideas," indicating that these contributions relate to post conception reduction to practice, rather than conception itself:

Q. And can you describe for me your contribution to the step of creating a meta index of all the data files as stated in the '489 application.

A: That is one of the first pieces of the software that I was working on.

*Id.*, 108:14-21.

Q. And what was your contribution to that step?

A: Discussions and code.

*Id.*, 114:12-18.

Importantly, Messrs. Caso and Abraham confirmed that Mr. Drew's work consisted of coding the ideas they had already conceived, or otherwise being directed and assigned to do coding work. All three individuals have consistently testified about the proper attribution of relevant/pertinent ideas and agreed that no ideas should be attributed to Mr. Drew. UMF 26-31; *see also* Ex. 18, 183:19-24. ("Well, I don't want to confuse anyone at the company having no contribution to what a company does. But in terms of the drafting of the idea, the application, you know, things like that, it was simply not something that we were working with Mr. Drew when we were producing it."); Ex. 21, 62:3-11 ("Q. Between February of 2009 and May of 2009, was Mr. Caso working on a system consisting of a web service and software client? THE WITNESS: I'm not exactly sure the point of your question. He was not -- it was his idea. He was thinking about it, directing. But actually doing, not so much."); *see also id.*, 111:23-112:4 ("Q. Did Mr. Caso contribute to the idea of the web service integrating all meta indices into a database?  A. Yes. It's his company. This is his idea. Yes, he contributed."). Accordingly, Mr.

Drew's activities reducing to practice various ideas does not qualify him as a joint inventor for those ideas. *Ethicon*, 135 F.3d at 1460.[3]

**B.      Matt Drew's Contributions Relate to Reducing to Practice Ideas Already Conceived by Erik Caso Before Matt Drew Started Work at Entangled Media**

Within the first business day of Matt Drew signing a consulting agreement and obtaining his Entangled Media email account, Erik Caso shared documents with Matt Drew detailing technical details of the invention that would ultimately be included within the Provisional Application. UMF 11-16. Mr. Caso confirms that he created these documents, and that Mr. Drew provided no input into the creation of these documents. *See id.*, 11-16, 20, 27, 30. Importantly, these documents provide both a detailed and general overview of several key ideas included within the Provisional Application, and these ideas encompass the subject-matter that Matt Drew itemized as areas of his work or contributions. *Id.*, 11-16, 20, 27-30; *compare* Exhibits 8, 9, 11, & 12 *with* UMF 28-29. The overlap between the Matt Drew's recited activities and ideas already conceived by Erik Caso, confirm not only that Mr. Drew's activities relate to the reduction to practice of pre-conceived ideas, but also that Mr. Drew's activities relate to ideas that were not even his—rather, the ideas belonged Mr. Caso.

**C.      Matt Drew's Testimony as to His Contributions Lack Sufficient Corroboration**

Dropbox's allegations regarding Mr. Drew's contributions are primarily based on his unsupported, uncorroborated deposition testimony. Though Mr. Drew was named as an inventor on the Provisional Application, the Provisional Application does not detail or even mention any inventive contributions by Mr. Drew. Typically, sources of corroboration are the putative co-inventor's own documents or work-product, but it is undisputed that Mr. Drew had no role in drafting the Provisional Application. See UMF 20; Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1461 (Fed. Cir. 1998).

---

[3] Dropbox has treated the May 5, 2009 filing date as a priority date, meaning the contents of the Asserted Patents are found in the Provisional Patent. Accordingly, to the extent the Provisional Application represents a constructive reduction to practice, then conception of the relevant ideas would need to have occurred prior to the May 5, 2009 filing date—otherwise any activities subsequent to that date would constitute post-reduction activities that cannot qualify an individual as an inventor. *See Hess v. Advanced Cardiovascular Systems, Inc.*, 106 F.3d 976, 981 (Fed. Cir. 1997). Yet, in addition to failing to identify activities relating to conception, rather than reduction to practice, of various pertinent ideas, Mr. Drew's recited activities continued past the May 5, 2009 filing date of the Provisional Application.

In addition, Mr. Case provided a logical explanation as to why Mr. Drew was erroneously included as an inventor in the Provisional Application (because he lacked the prior knowledge and experience to know how to properly name inventors in a patent application). UMF 21. Accordingly, the Provisional Application, standing alone, is insufficient evidence to show improper inventorship.

> **D.    Any Incorrect Recitation of Inventors Can Be Administratively Corrected via this Court and the U.S. Patent Office Without Invalidating Any Patents**

Even in the unlikely event that Mr. Drew is determined to be a co-inventor,  correction of an inventorship error in a patent application is freely allowed by statute.[4] Congress provided for the correction of inventors named in an issued patent.[5]  Specifically, "[t]he error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly."[6]

For all of the above reasons, the Court should grant summary judgment with respect to Dropbox's inventorship-based invalidity arguments at its Third and Seventh Defenses, and Declaratory Judgment Counts V and VI.

> **4.    Legal Standard for Determining Inequitable Conduct**

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. This judge-made doctrine evolved from a trio of Supreme Court cases that applied the doctrine of unclean hands to dismiss patent cases involving egregious misconduct." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (compiling cases). "The remedy for inequitable conduct is [known as] the 'atomic bomb' of patent law," because "inequitable conduct as to any individual claim renders the entire patent unenforceable." *Id.*, 1288-89. The standard for establishing inequitable conduct is a demanding one:

> To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive

---

[4] *See* 37 C.F.R. § 1.48.
[5] *See* 35 U.S.C. § 256.
[6] 35 U.S.C. § 256 (b).

the PTO. The accused infringer must prove both elements -- intent and materiality --

by clear and convincing evidence.

*Therasense*, 649 F.3d at 1287 (internal citations omitted). Even if the accused infringer succeeds in both respects the district court "must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." *Id.*

"[T]he materiality required to establish inequitable conduct is but-for materiality." *Therasense*, 649 F.3d at 1291. A reference is but-for material if the PTO would not have allowed the claim had it been aware of the undisclosed prior art; the Court is to use the preponderance of the evidence standard and apply the broadest reading of the claims possible in making this determination. *Id.*, 1292. "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct." *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001). "[T]he fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008).

To successfully level an inequitable conduct defense the accused infringer must also show the plaintiff had the "specific intent to . . . mislead[ ] or deceiv[e] the PTO." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995).  In a misrepresentation or omission case, a "gross negligence" or "should have known" standard does not satisfy the requirement, instead an accused infringer must show the patentee "made a deliberate decision to withhold a known material reference." *Therasense*, 649 F.3d at 1290 (quoting *Molins*, 48 F.3d at 1181). "Because direct evidence of deceptive intent is rare, [the Court] may infer intent from indirect and circumstantial evidence. However, to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (citations omitted) (quoting *Star Sci., Inc.*, 537 F.3d at 1366). "Indeed, the evidence 'must be sufficient to require a finding of deceitful intent in the light of all the circumstances.' *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed. Cir. 1988) (emphasis added). Hence, ***when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.*** " *Therasense*, 649 F.3d at 1290-91 (emphasis added).

If the Court finds reasonable any explanation as to why Matt Drew was not disclosed as an inventor, and that explanation does not involve deceptive intent, then as a matter of law, specific intent to deceive (and by extension, inequitable conduct) cannot be found.

### 5.    As a Matter of Law, Dropbox Cannot Show Inequitable Conduct

Dropbox's inequitable conduct claims must fail as a matter of law because the (i) the inventor declarations are not false, (ii) the inventor declarations do not provide Dropbox with "materiality" required by *Therasense*, and (iii) Dropbox fails to show any specific intent to deceive as required by *Therasense*.

### A.    The Inventor Declarations Are Not False

Dropbox asserts the inventor declarations are false for stating that the named inventors are the only co-inventors, rather than additionally identifying Matt Drew as a co-inventor. Dropbox's allegations fail for at least two reasons.

First, as set forth above, Matt Drew is correctly not named as an inventor in the Asserted Patents because his alleged contributions were not inventive in nature; instead, he reduced to practice Mr. Caso and Mr. Abraham's ideas. UMF 20, 26-31.

Second, even in the unlikely event that the Court finds Matt Drew to be an unnamed co-inventor, the declarations signed by Messrs. Abraham and Caso would remain true, because they do not unequivocally assert they are the only co-inventors—rather, each declaration merely asserts that at the time of signing, each named inventor "***believe[s]*** [they are]. . . an original, first and joint inventor . . . of the subject matter which is claimed." Ex. 24, EM_00000045 (emphasis added). This belief remains true regardless of what a Court determines nearly fifteen years after the signing of the inventor declarations, given that at the time, Mr. Caso contemporaneously communicated his belief that none of Mr. Drew's work contributions (coding and research) were useful in the context of the Asserted Patents. Ex. 17; UMF 24. This is especially true in light of the testimony from all involved that Mr. Drew only contributed to reducing the inventions to practice, and Mr. Drew's was only named as an inventor on the Provisional Patent because it was Entangled Media's first patent application, written without the benefit of counsel, and Mr. Caso erred on the side of caution to be over- rather than under-inclusive. UMF 20-21, 26-31.

### B.    The Allegedly False Inventor Declarations Are Not Material

Under *Therasense*, an act or omission is "but-for material" if the U.S. Patent Office would not have allowed a claim but for the act or omission. *Therasense*, 649 F.3d at 1291. Dropbox alleges merely that: "The Asserted Patents would not have issued to Messrs. Caso and Abraham alone." Dkt. No. D151-4 [Amended Answer] at ¶ 41. This is insufficient to establish but-for materiality, because inequitable conduct "should only be applied in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim." *Id.,* 1292. Dropbox's apparent reliance on *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000) is unavailing. Although the *PerSeptive* court found disclosures regarding inventorship to be material, this finding pre-dated *Therasense,* and was therefore grounded on a much broader definition of materiality, which only required that a "reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Id.*, 1322.[7]

### C.    Dropbox Cannot Show the Required Specific Intent to Deceive

It is more than reasonable, given the facts of record, for the Court to conclude that Messrs. Caso and Abraham did not disclose Matt Drew as a coinventor because they believed he was not a coinventor and not because there was any intent to deceive, especially in view of the following facts:

(i)    Matt Drew's inclusion in the Provisional Application resulted from an intent to be "overinclusive," and this decision was made without the benefit of patent counsel. (UMF 20-21.)

(ii)    Messrs. Caso and Abraham later had the benefit of patent counsel when prosecuting The Asserted Patents. (UMF 23.)

(iii)    Matt Drew received (what was effectively) a draft provisional application within days of starting work at Entangled Media, and he was directed and told what to develop and code. (UMF 9-17, 27-31.)

---

[7] Dropbox cannot tenably show that an exception to but-for materiality applies, for example the declarations being "unmistakably false" and therefore "per se material. Not only are these declarations clearly not "unmistakably false" but they are also not the type of evidence to be held "per se" material, because they were not the basis for the grant of the Asserted Patents or essentially material to a basis for their grant. *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.,* 695 F.3d 1285, 1307 (Fed. Cir. 2012).

(iv)   When Mr. Caso worked with his patent counsel to prepare the applications for the Asserted Patents in 2010 and forwarded to his patent counsel the Provisional Patent Application that named Matt Drew as an inventor, he informed his patent counsel at that time of his belief that none of Matt Drew's contributions were used or useful to Entangled Media. (UMF 24.)

(v)   Matt Drew's contributions are similarly not used or reflected in the subject-matter claimed in the Asserted Patents. Ex. 17; UMF 26-31.

In this scenario, multiple reasonable explanations exist that do not involve deceptive intent, and accordingly, "intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290-91.  It is therefore legally impossible to find specific intent to deceive regardless of whether this Court ultimately determines that Matt Drew is a co-inventor making a drafting mistake not sufficient to meet the intent requirement. *Astrazeneca Pharms. LP v. Teva Pharms. USA, Inc.*, 583 F.3d 766, 776 (Fed. Cir. 2009) (citing *Kingsdown*, 863 F.2d at 876) ("Evidence of mistake or negligence, even gross negligence, is not sufficient to support an inference of deceptive intent.")

For all of the above reasons, the Court should grant summary judgment with respect to Dropbox's inequitable conduct-based Seventeenth Defense, and Declaratory Judgment Counts V and VI.

## IV.   THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT OF NO INVALIDITY OVER THE FOLDERSHARE REFERENCE.

### 1.   Dropbox Misconstrues the FolderShare Reference

It is undisputed that that the FolderShare reference asserted by Dropbox consists of eighteen separate URLs spanning from 2003-2007. *See generally* Ex. 28, DRBX_EM_531971.[8] Dropbox's expert Dr. McDaniel confirmed relying on different publications across a four-year time period for this reference during his deposition. Ex. 29, 61-62 ("Q. For the FolderShare reference, are you relying on the URLs in Exhibit 6 that are dated 2003, 2004, 2006 and 2007? [Objection] A. I would have to go through the individual report.  The documents that I'm re- -- that I'm -- that I'm referring to – that I'm -- that I'm using for the prior -- for the prior -- for the date for FolderShare -- Q. Well, why would you

---

[8] The FolderShare reference is attached as Ex. A to the "Affidavit of Christopher Butler" at Ex. 28

have attached a document to Exhibit 6 if you're not relying on it in this report? [Objection] A. I'm relying on different documents for FolderShare. Q. Correct. And those documents are dated between 2003 and 2007, correct? A. Correct.").

Dropbox treats "FolderShare" as one single unifying reference, and makes no effort to show any motivation to combine any of the different embodiments and disclosures across these eighteen publications from the four years FolderShare existed. *See, e.g.,* Ex. 30, ¶ 600. This omission is not merely an oversight. Dr. McDaniel confirmed at deposition that "I think that is proper" to combine different publications from different points in time to count as one reference. Ex. 29, 62:3-17. And using this faulty analysis, Dr. McDaniel opines that "FolderShare" on its own discloses numerous claim elements, including claim elements 1[A], 1[B], 1[C], 1[D], and 1[H] for the '260 patent, and claim elements 1[A], 1[B], 1[C] for the '338 patent. Ex. 30, ¶¶ 568, 574, 580, 584, 600, 954, 959, 964. This faulty invalidity analysis regarding FolderShare fails as a matter of law.

Even when a single reference is used to show obviousness, the Court "consider[s] whether a POSITA would have been motivated to combine the prior art to achieve the claimed invention." *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citations omitted); *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). "Even when obviousness is based on a single prior art reference, there must be a showing of a suggestion or motivation to modify the teachings of that reference." *In re Kotzab,* 217 F.3d 1365, 1370 (Fed. Cir. 2000); *see also In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017) ("Whether a rejection is based on combining disclosures from multiple references, combining multiple embodiments from a single reference, or selecting from large lists of elements in a single reference, there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful.").

Dropbox never explains, or even acknowledges, its decision to combine multiple publications made over a four-year span into a single instrument. Thus, Dropbox cannot show by clear and convincing evidence that the claims of the Asserted Patents are invalid over FolderShare, either alone or in combination with any other reference.

**2.    Dropbox Provides No Evidence of "Reasonable Expectation of Success" to Support the FolderShare Combinations**

Obviousness requires a showing not only of motivation to combine, but also a reasonable expectation of success. *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.,* 876 F.3d 1350, 1360–61 (Fed. Cir. 2017) ("We have held that where a party argues a skilled artisan would have been motivated to combine references, it must show the artisan 'would have had a reasonable expectation of success from doing so.'") (*quoting In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.,* 676 F.3d 1063, 1069 (Fed. Cir. 2012)). Thus, a finding of obviousness with no corresponding finding of reasonable expectation of success constitutes reversible error. *See OSI Pharms., LLC v. Apotex Inc.,* 939 F.3d 1375, 1385 (Fed. Cir. 2019) (reversing obviousness determination where there was no substantial evidence of reasonable expectation of success). It is the defendant's burden to establish reasonable expectation of success with "clear and convincing evidence." *Procter & Gamble Co. v. Teva Pharms. USA, Inc.,* 566 F.3d 989, 994 (Fed. Cir. 2009).

In both its final invalidity contentions and invalidity report, Dropbox merely concludes "a reasonable expectation of success" with any combination with FolderShare. *See* Ex. 31, 21 (With respect to FolderShare, "A POSITA would have had a reasonable expectation of success in combining their teachings, as they relate to the same field and combining them would take merely ordinary skill."); Ex. 30, ¶ 605 ("A PHOSITA would have had a reasonable expectation of success in combining FolderShare with Sekar at least because implementing the details of Sekar with the FolderShare (and FolderShare in view of Havewala) system would have been well within a PHOSITA's capabilities and for additional the reasons discussed herein."); *See also Id.*, ¶¶ 1022, 1026. Such generalized and conclusory opinions cannot create a disputed issue of material fact, especially in light of Dropbox's heavy burden to do so. *See MobileMedia Ideas LLC v. Apple Inc.,* 780 F.3d 1159, 1172 (Fed. Cir. 2015).

Dr. McDaniel's testimony is no more detailed than the conclusory allegation of reasonable expectation of success rejected in *Asetek Danmark A/S v. CooIT Systems, Inc*, Case No. 19-cv-00410-EMC, Dkt. 504 at 12-13 (N.D. Cal. Sept. 11, 2022). There, the defendant's expert testified that "the combination or modification is also based on conventional or known methods that would have yielded

predictable results and been reasonably expected to be successful by a POSITA." *Id.* (internal alteration omitted). The court concluded that "[t]his conclusory assertion is insufficient [to] show reasonable expectation of success," and granted the plaintiff's motion for summary judgment of no invalidity. *Id*

Because Dr. McDaniel's opinion regarding FolderShare's combination is unexplained and conclusory, it is insufficient to avoid summary judgment on an issue where Dropbox bears the burden of proof by clear and convincing evidence.

## V.   ENTANGLED MEDIA IS ENTITLED TO SUMMARY JUDGMENT ON DROPBOX'S TENTH, ELEVENTH, AND SIXTEENTH AFFIRMATIVE DEFENSES

Entangled Media is entitled to summary judgment denying Dropbox's Tenth Affirmative Defense (limitations on damages and costs) based on Section 286. Section 286 (time limitation on damages) is undisputed in this case because Entangled Media is not seeking damages beyond six years of filing suit. Further, Dropbox has provided no facts supporting such a defense. Dropbox's response to Interrogatory No. 9 in support of its Tenth Affirmative Defense does not substantively address Section 286. Ex. 32, 62-63.

Similarly, Entangled Media is entitled to summary adjudication denying Dropbox's Eleventh Affirmative Defense (failure to provide notice pursuant to 35 U.S.C. § 287). Dropbox has provided no facts supporting such a defense. Dropbox's response to Interrogatory No. 9, in support of its Eleventh affirmative defense, does not substantively address Section 287. *Id.*

Further, Entangled Media has only asserted method claims throughout this litigation; a Section 287 defense does not apply to method claims. *Crown Packaging Tech. v. Rexam Beverage Can Co.*, 559 F.3d. 1308, 1317 (Fed. Cir. 2009).  To the extent that marking does apply to the method claims in this case, this defense fails because Entangled Media did provide actual notice to Dropbox. Before a lawsuit, "the actual notice requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997). "[A]s long as the communication from the patentee provides sufficient specificity regarding its belief that the recipient may be an infringer, the statutory requirement of actual notice is met." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1346 (Fed. Cir. 2001).  Here, the

undisputed evidence demonstrates that Entangled Media informed Dropbox of "the identity of the patents" (the '260 and '338 patents), and "identified the activity that is believed to be an infringement" (Defendants' use of Smart Sync in its products) and provided a "proposal to abate the infringement" (that Defendants "require a license"). *See SRI Int'l*, 127 F.3d at 1470; UMFs 32-34. Therefore, Entangled Media is entitled to summary judgment that Dropbox was on actual notice of its infringement of the Asserted Patents by March 2017.

Lastly, with respect to Dropbox's Sixteenth Affirmative Defense based on Lack of Standing, Dropbox has provided no facts whatsoever supporting such a defense. Dropbox's response to Interrogatory No. 9, in support of its Sixteenth Affirmative Defense, merely states that "Plaintiff is not the current or sole oner of all substantial rights in the Asserted Patents, and Plaintiff's claims and requested relief are barred by its lack of standing." Ex. 32, 63. Further, the Court has already reviewed the funding documents *in camera* and held that "Chisum does not appear to have any present right, title, or interest in the asserted patents that would implicate or undermine Entangled Media's standing to sue." Dkt. No. 132, 1.

Thus, the Court should grant summary judgment in Entangled Media's favor on Dropbox's Tenth, Eleventh and Sixteenth Affirmative Defenses.

## VI.    THE COURT SHOULD GRANT SUMMARY JUDGMENT OF PATENT ELIGIBILTY UNDER 35 U.S.C. §101.

On February 13, 2024, this Court denied Dropbox's Motion to Dismiss for patent-eligibility under 35 U.S.C. § 101. Dkt. No. 87. In its Order, the Court held that "Dropbox's Section 101 arguments can and will be addressed at this stage rather than reserved until claim construction." *Id,* 7. The Court held as a matter of law that Dropbox "has not established by clear and convincing evidence that Claim 1 of each asserted patent is directed to an abstract idea" *Id.,* 11. Because the Court held that the asserted claims are not directed to an abstract idea, the *Alice* inquiry ends. *See Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1378 (Fed. Cir. 2024) ("If the claims are not directed to an abstract idea, the *Alice* inquiry ends.").

Though the Court has resolved patent eligibility, Dropbox has continued to assert a §101 invalidity defense based on ineligible subject matter. Ex. 33, 136. "Whether a claim recites patent

eligible subject matter is a question of law which may contain disputes over underlying facts. Patent eligibility has in many cases been resolved on motions to dismiss or summary judgment." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). As the Court has already resolved this matter, Entangled Media requests that the Court grant summary judgment in its favor on Dropbox's §101 invalidity defense.

## VII.    CONCLUSION

For the foregoing reasons, the Court should grant Entangled Media's Motion for Partial Summary Judgment.

Dated: March 10, 2025

*/s/ Alexander E. Gasser*
John E. Lord (SBN 216111)
SKIERMONT DERBY LLP
633 W. Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213)788-4545
jlord@skiermontderby.com

Paul J. Skiermont (*pro hac vice*)
(TX Bar No. 24033073)
Jaime K. Olin (SBN 243139)
Ryan A. Hargrave (*pro hac vice*)
(TX Bar No. 24071516)
Alexander E. Gasser (*pro hac vice*)
(WI Bar 1022659)
SKIERMONT DERBY LLP
1601 Elm Street, Suite 5800
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
jolin@skiermontderby.com
rhargrave@skiermontderby.com
agasser@skiermontderby.com

*Attorneys for Plaintiff*
ENTANGLED MEDIA, LLC

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
5:23-CV-03264-PCP-VKD