Anton "Tony" Handal (SBN 113812)
thandal@munckwilson.com
John E. Lord (SBN 216111)
jlord@munckwilson.com
Brent J. Lehman (SBN 282149)
blehman@munckwilson.com
Georgiana A. Nikias (SBN 283718)
gnikias@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
1925 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone: (310) 855-3311
Facsimile: (972) 628-3616

Alex Jablonski (admitted *PHV*)
ajablonski@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
2000 McKinney Avenue, Suite 1900
Dallas, TX 75201

*Attorneys for Plaintiff*, Entangled Media, LLC

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ENTANGLED MEDIA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DROPBOX, INC.,<br><br>Defendant. | Case No. 5:23-cv-03264-PCP<br><br>**EXPERT DECLARATION OF GEORGE EDWARDS IN SUPPORT OF PLAINTIFF ENTANGLED MEDIA'S MOTION FOR RECONSIDERATION AND STAY** |

I, George Edwards, declare as follows:

1. I have been retained as a technical expert by Entangled Media, LLC ("Entangled Media") for its litigation against Dropbox, Inc. ("Dropbox") to provide analysis and opinions related to the Patents-in-Suit, particularly U.S. Patent No. 8,296,338 ("the '338 Patent").

2. I signed the Protective Order in this case on November 28, 2023.

## QUALIFICATIONS

3. I previously submitted a declaration in this matter (Dkt. No. 101-2) regarding claim construction of the asserted claims. I incorporate my experience and qualifications from my prior declaration herein.

4. As set forth in my prior declaration, I hold a Ph.D. in Computer Science from the University of Southern California (2010), an M.S. in Computer Science from USC (2006), and a B.S. in Computer Science from Vanderbilt University (2003). Since June 2012, I have served as President and Principal Computer Scientist at Quandary Peak Research, LLC. My research and publications span distributed systems, distributed data storage, peer-to-peer architectures, server-based web services, and software architecture and design. I served as a Lecturer at USC from 2012 to 2017.

5. From September 2003 to May 2004, I worked as a graduate research assistant in the Computer Science Department at Vanderbilt University, where my work developing novel and experimental systems related to software engineering, including networking and file systems. From June 2005 to August 2006, I worked as a software engineer at The Boeing Company, where my work on the Future Combat Systems (FCS) involved software engineering related to the System-of-Systems Common Operating Environment (SoSCOE), which managed essential file system and networking functions in FCS. From May 2008 to August 2008, I worked as a graduate research intern at IBM, where I worked on various software engineering research projects that utilized and managed the file systems and networking capabilities of mobile devices and servers. From August 2004 to August 2010, I was a graduate fellow in the Computer Science Department at USC, where I worked on numerous research projects, grants, and classes related to software engineering, file systems, and networking, among other topics.

6. For purposes of this declaration, I have been asked to provide my opinions and the

technical facts the Court needs to apply relating to prosecution history estoppel as applied to the ’338 Patent’s “indistinguishable” “to the user” limitation of claim 1, including: (a) the technical meaning of references cited during prosecution; (b) the objectively apparent reason for the July 2012 amendment; (c) whether the amendment bears no more than a tangential relationship to the accused equivalents; and (d) whether the accused equivalents were foreseeable at the time of the amendment.

**PERSON OF ORDINARY SKILL IN THE ART**

7. As I explained in my prior declaration, a person of ordinary skill in the art (“POSITA”) at the time of the ’338 Patent would have had a bachelor’s degree in computer science, electrical engineering, or a similar discipline, along with at least two years of relevant professional experience in software engineering or a similar field. Alternatively, a POSITA could have an advanced degree (such as a master’s degree) in a relevant field with less professional experience. My analysis herein would not change if a slightly revised definition of a POSITA were adopted, as advocated by Dropbox’s expert Dr. McDaniel. My opinions below are given from the perspective of such a person.

8. Given my knowledge, skill, and experience I am a POSITA for the subject matter of this case, either under my definition or under Dr. McDaniel’s definition.

**MATERIALS CONSIDERED**

9. For the purposes of this declaration, I have analyzed the ’338 Patent, the file history for the ’338 Patent, the references identified in the file history, and the relevant briefing and Court Order related to Dropbox’s pretrial motion related to prosecution history estoppel. I also have relied on my academic and professional experience in reaching the opinions expressed in this declaration.

10. I incorporate my prior testimony in my opening expert report regarding the overview of the technology of the ’338 Patent.

**LEGAL PRINCIPLES**

11. I am not a legal expert and offer no opinions on the law. I have, however, been informed by counsel of the various legal standards that apply with respect to the doctrine of equivalents and prosecution history estoppel. I have applied those standards when making the statements in this declaration and arriving at my conclusions.

12. I have been informed that prosecution history estoppel acts as a legal limitation on the

doctrine of equivalents. The doctrine "prevents a patent owner from recapturing with the doctrine of equivalents subject matter surrendered to acquire the patent."

13. I have been informed that prosecution history estoppel does not apply when 1) the equivalent was unforeseeable at the time of the amendment, 2) the rationale for the amendment bears no more than a tangential relation to the equivalent, or 3) some other reason that the patentee could not reasonably be expected to have described the equivalent.

14. I have been informed that if the reason for the narrowing amendment was peripheral to the alleged equivalent, then it is tangential.

15. I have been informed that the tangential exception applies when the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question. The inquiry turns on the patentee's objectively apparent reason for the narrowing amendment, which must be discernible from the prosecution history record. That reason is measured against the specifics of the amendment and the rejection that provoked the amendment, and cannot be determined without reference to the context in which it was made, including the prior art that might have given rise to the amendment.

## FILE HISTORY AND PRIOR ART

### Summary of the File History

16. The file history of the '338 Patent shows that the examiner issued an Office Action on April 26, 2012, rejecting claims 1-7 and 13-15. For the purposes of this declaration, I will focus on the rejection of claims 1, 5, and 6 and the subsequent amendment of claim 1 on July 20, 2012.

17. A true and correct copy of relevant portions of the file history is attached hereto as **Exhibit 1** and is incorporated by reference as though fully set forth herein.

18. In the April 2012 Office Action, the examiner stated, "Claims 1-3, 7, and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Vesper (U.S. 2011/0110568) in view of Wills (U.S. 2012/0079117)." Ex. 1, at EM_00000307. With respect to claim 1, the examiner found that "Vesper discloses substantially all of the elements…except scanning each of the multiple devices by each of the individual software clients to inventory data on each of the multiple devices and create a meta-index of the files for the inventoried data; providing by the individual software clients via the multiple devices

individual meta-indices of the inventoried data for each of the multiple devices to the at least one server." *Id.* at EM_00000307-309. The examiner found that Wills "teaches scan and index data stored in a single device or a plurality of different devices (paragraph [0012]; Claim 19, 22)." *Id.* at EM_00000309.

19. In the same April 2012 Office Action, the examiner stated, "Claims 5-6, 14-15 are rejected under 35 U.S.C. 103(a) as being unpatentable over Vesper (U.S. 2011/0110568) in view of Wills (U.S. 2012/0079117) and further in view of Ben-Shaul (U.S. 2011/0231844)." Ex. 1, at EM_00000313. With respect to claim 5, the examiner found that "The combination of Vesper and Wills discloses substantially all of the elements of claim 1, except wherein the individual software clients facilitate storage of the data within each of the multiple devices in accordance with the meta-data by modifying file systems of each of the multiple devices to include virtual files for data from the single meta-data index that is not local to a multiple device." *Id.* The examiner found that Ben-Shaul "teaches the metadata information for a particular virtual disk may include: a virtual disk identifier that uniquely identifies that particular virtual disk; a device identifier that uniquely identifies a particular computing device that stores the disk content of that particular virtual disk; and any other data associated with the particular virtual disk and/or the particular computing device, (paragraph [0047])." *Id.* at EM_00000313-314.

20. With respect to claim 6, the examiner found that "[t]he combination of Vesper and Wills discloses substantially all of the elements of claim 6, except wherein the individual software clients facilitate creation of a visual representation of the virtual files on a remote one of each of the multiple devices that is indistinguishable from a visual representation of an actual file that is located on a local one of the multiple devices." Ex. 1, at EM_00000314. The examiner found that "Ben-Shaul teaches a set of images that collectively represents data that is stored at a particular computing device. For example, virtual disk 112a stores a set of images that store the data from computing device 130a, virtual disk 112b stores a set of images that store the data from computing device 130b, and similarly virtual disk 112n stores a set of images that store the data from computing device 130n, paragraph [0045])." *Id.* at EM_00000314-315.

21. In summary, the April 2012 Office Action found that the limitation of claim 5 ("wherein

the individual software clients facilitate storage of the data within each of the multiple devices in accordance with the meta-data by modifying file systems of each of the multiple devices to include virtual files for data from the single meta-data index that is not local to a multiple device") was not disclosed in the combination of Vesper and Wills, and the examiner relied on Ben-Shaul for the disclosure of that limitation.

22. In the applicant's July 2012 Amendment and Response, the applicant amended claim 1. The applicant noted that "As pointed by the Office Action, Vesper and Wills fail to describe 'the individual software clients facilitate storage of the data within each of the multiple devices in accordance with the meta-data by modifying file systems of each of the multiple devices to include virtual files for data from the single meta-data index that is not local to a multiple device' as recited in claim 6. Instead, the Office Action relies the teachings of Ben-Shaul." Ex. 1, at EM_00000347.

23. The applicant then stated:

> *Ben-Shaul describes a desktop delivery system where multiple computing devices are connected to a single data center 102 that includes a separate virtual disk 112a, 112b, 112n for each computing device 130a, 130b, 130n. In particular, "each virtual personal disk is a set of images that collectively represents data that is stored at a particular computing device." Paragraph [0035]. As such, all virtual personal disks 112a, 112b, 112n are stored in a single data center 102 to help IT manage a large number of enterprise desktop computers from a central location (Admin Management Client 120). There is no suggestion in Ben-Shaul to have the virtual personal disk of computing devices stored in other computing devices because it would fragment further the IT management of the enterprise desktops. Thus, Ben-Shaul describes storing the virtual personal disk of Computing Device 130a in a central data center 102 and not in other Computing Devices such as 130b or 130n.* (*Id.*)

24. The applicant amended claim 1 as follows:

> providing by the at least one server the single master meta-index <u>and meta-indices for each of the other multiple devices</u> to each of the multiple devices via the individual software clients;

<u>integrating metadata from the meta-indices of each of the other multiple devices into a local file system of each of the multiple devices to generate virtual files stored in the same locations as local files of the local file system, the virtual files indistinguishable from the local files by the local file system at each of the multiple devices;</u> and

25. The applicant did not amend claim 5 or claim 6 in its July 2012 amendment.

**<u>Vesper</u>**

26. U.S. 2011/0110568 ("Vesper") is a patent application spanning 98 pages. Attached hereto as **Exhibit 2** is a true and correct copy of the Vesper patent application and is incorporated by reference as though fully set forth herein.

27. Vesper explains that "[t]he present application is directed to a system and method for the storage and distribution of medical records, images and other personal information, including DICOM format medical images." Ex. 2, ¶ [0069].

28. With respect to "images", Vesper explains this relates to medical images such as MRIs and not visual images that represent virtual files in a file browser/user interface. *Id.*, *e.g.,* at Abstract.

29. Vesper further describes its system as "a network that makes it possible for records comprising personal information and other non-personal information to be delivered in seconds via the Internet," rather than through conventional physical couriers. *Id.*, ¶ [0070]. Thus, Vesper principally concerns identifying, locating, transferring, and viewing medical records across a network.

30. Vesper does not describe presenting remote files as virtual files within a device's local file system or discuss whether virtual files should be visually distinguishable or indistinguishable from local files.

31. Vesper uses a central index to identify the location of records stored at different nodes. Vesper explains that its database server "comprises the Central Index 38 and thus is the main repository for patient information (PHI) and the location of related records on the system." *Id.*, ¶ [0108]. Vesper further explains that "the actual Body of the records is located on the Local Storage Nodes and not sent to the Central Server 14." *Id*. In another embodiment, Vesper similarly states that "[t]hrough the central index 3702 each image received from the network 100 can be assigned a globally unique identifier" and that "[t]he central index 3702 can track the location and disposition of each discrete DICOM

image." *Id.*, ¶ [0298].

32. These disclosures concern maintaining metadata identifying actual remotely stored records. They do not describe using that metadata to generate virtual files in the local file system of another device.

33. Vesper describes a specialized "viewer application" through which a physician accesses medical records. According to Vesper, "[t]he user application or viewer application 40 is the component record consumers use to view the current records available to that record consumer." *Id.*, ¶ [0160]. The viewer "allows multiple records to be loaded simultaneously in the application to allow side by side and other types of comparisons." *Id*. Importantly, Vesper states that "[o]nly records trusted to the record consumer that are found on the target node will be displayed in the application." *Id.*, ¶ [0161]. For records not located on that device, Vesper separately provides that "[r]ecord consumers can request records that do not exist on the target." *Id*.

34. Vesper therefore differentiates between records already present at the target node, which can be displayed, and remote records that must be requested. It does not describe displaying the remote records as virtual files alongside actual local files, so Vesper never addresses whether such virtual files would have the same or different visual appearance to the user.

**<u>Wills</u>**

35. U.S. 2012/0079117 ("Wills") is a patent application. Attached as **Exhibit 3** is a true and correct copy of the Wills patent application and is incorporated by reference as though fully set forth herein.

36. Wills explains that "[t]he present invention relates to data processing systems, and more particularly to systems capable of scanning and indexing data." Ex. 3, ¶ [0001].

37. Wills describes a "universal engine operable to scan and index data stored in at least one device, for a plurality of different purposes," together with "at least one application for controlling the universal engine to perform the scanning and indexing for at least one of the different purposes." *Id.*, ¶ [0005].

38. Thus, Wills is principally concerned with scanning and indexing data for purposes such as security, compliance, search, and data classification. It does not describe a cloud file synchronization

system in which remote files are represented as virtual files within a device's local file system.

39. Wills explains that "scanning may include any analysis of data," while "indexing may refer to any processing which results in a data structure that is representative, at least in part, of the data, for facilitating subsequent analysis." *Id.*, ¶ [0013]. The indexing may be based on "content of the data, a creator of the data, a location of the data, metadata associated with the data, and/or any other desired aspect of the data." *Id.*, ¶ [0014]. Wills further states that the universal engine may be controlled for "a security purpose, a corporate governance purpose, a data loss prevention purpose, a risk management purpose, a legal purpose, a digital rights management purpose, a data classification purpose, a search purpose, etc." *Id.*, ¶ [0015].

40. These disclosures concern analyzing data and creating indexes used for subsequent analysis and policy enforcement. They do not describe using indexed metadata to create virtual representations of remotely stored files, much less address how such virtual files would appear relative to local files to the user.

**<u>Ben-Shaul</u>**

41. U.S. 2011 /0231844 ("Ben-Shaul") is a patent application. Attached as **Exhibit 4** is a true and correct copy of the Ben-Shaul patent application and is incorporated by reference as though fully set forth herein.

42. Ben-Shaul describes a "desktop delivery" system for enterprise IT management in which a central data center stores a "virtual personal disk" for each employee's computing device.

43. Ben-Shaul states that "each virtual personal disk is a set of images that collectively represents data that is stored at a particular computing device." Exhibit 4, ¶ [0045]. For example, "virtual disk 112a stores a set of images that store the data from computing device 130a," while virtual disk 112b stores the data from computing device 130b. *Id*. Ben-Shaul also associates each virtual disk with metadata, including "a virtual disk identifier that uniquely identifies that particular virtual disk" and "a device identifier that uniquely identifies a particular computing device that stores the disk content of that particular virtual disk." *Id.,* ¶ [0047]. That metadata is used by the data-center logic "to determine which virtual disk needs to be updated" and "to determine to which computing device to send images from a particular virtual disk." *Id*.

44. Nothing in these disclosures describes presenting remote files as virtual files alongside local files to a user or describes the visual appearance of local files relative to virtual files. The images of Ben-Shaul that the examiner relied on were the disk images, not visual file icons. Ben-Shaul does not describe those "images" as file icons or other graphical representations presented to a user; it defines an "image" instead as data representing some portion of a device's disk contents. *Id.*, ¶ [0028].

45. Accordingly, Ben-Shaul does not discuss whether local and virtual files should be visually distinguishable or indistinguishable to the user.

## FACTS AND OPINIONS

### The Technical Meaning of "Images" and "Identifiers" in Ben-Shaul

46. In my opinion, a POSITA reading Ben-Shaul would understand "a set of images" to refer to disk images, which are binary copies of a storage device's contents, not visual file icons displayed to a user. In the field of distributed computing and enterprise virtualization, "image" is a well-established term of art for a byte-for-byte snapshot of a storage volume or a portion of the data on a storage volume. Common examples include .iso, .img, .vmdk, and .vhd files. A disk image has no visual component; it is a data container.

47. Similarly, Ben-Shaul's metadata identifiers are machine-readable database entries used for backend administration. Ben-Shaul discloses "a virtual disk identifier that uniquely identifies that particular virtual disk" and "a device identifier that uniquely identifies a particular computing device." These identifiers allow the central data center to programmatically track which disk image belongs to which device. These identifiers are not visual markers, status icons, or anything perceptible to an end user.

48. Ben-Shaul's own specification confirms that its "images" are storage data, not graphics or visual display elements. Paragraph 28 defines a "Personal Virtual Disk" as "a set of images that collectively represent the data (or some portion thereof) that is stored at a computing device," and defines "image" as "a set of data and executables that is at least a portion of the disk content," which may be "binary data, raw disk blocks, raw data partitions," or structured files. Ex. 4, ¶ 28. Paragraph 46 further explains that these images include "base image elements (which may include, for example, OS files that are shared among different computing devices), machine state elements (which may

include, for example, configuration files that are specific to the corresponding computing device, but are not specific to any user of that device), and user area elements (which may include files that are specific to a particular user of the computing device)." *Id.*, ¶ 46. These "images" are "snapshots" of the bits encoded on a storage device in a computer. *Id.*, ¶ 53. They are not graphical or visual images like a picture or icon.

49. Ben-Shaul's "identifiers" are likewise non-visual. Paragraph 47 states that the metadata associated with each virtual disk "is used by data center logic to determine which virtual disk needs to be updated when disk content changes are received from a particular computing device, and to determine to which computing device to send images from a particular virtual disk." *Id.* ¶ 47. These identifiers are used for automated management functions within the data center's internal logic. They are never presented to, or perceptible by, an end user. Ben-Shaul also discloses an "offline readiness indicator," which is described as "a flag in an associated data structure" *Id.* ¶ 99. The "offline readiness indicator" is also a binary value stored in memory, not a visual marker.

50. Accordingly, in my opinion, a POSITA would not understand Ben-Shaul as addressing the visual distinguishability of files. Ben-Shaul's system distinguishes its virtual disks through backend metadata at the data-center level. No user interface, graphical display, or visual marker is involved in or required for this process.

**<u>The Objectively Apparent Reason for the July 2012 Amendment</u>**

51. On July 20, 2012, the applicants amended claim 1 of the '338 Patent to add in relevant part: "integrating metadata from the meta-indices of each of the other multiple devices into a local file system of each of the multiple devices to generate virtual files stored in the same locations as local files of the local file system, the virtual files indistinguishable from the local files by the local file system at each of the multiple devices."

52. The amendment was made in response to the United States Patent and Trademark Office's ("USPTO") rejection of claim 1 under 35 U.S.C. § 103(a) as obvious over Vesper in view of Wills, and claims 5 and 6 under 35 U.S.C. § 103(a) as obvious over Vesper in view of Wills and further in view of Ben-Shaul. Ex. 1, at EM_00000347

53. In the applicants' remarks accompanying the amendment, they differentiated Ben-Shaul

by explaining that Ben-Shaul stored all virtual personal disks in a single central data center and did not distribute them to other computing devices, while the claimed invention distributed metadata from each of the devices to each device so that each device could integrate that metadata into its own local file system and generate virtual files locally. *Id.*

54. In my opinion, a POSITA reading the prosecution history would understand the objectively apparent reason for the amendment as architectural: to distinguish the claimed distributed-metadata system (in which each device integrates metadata into its own file system to generate local virtual files) from Ben-Shaul's centralized architecture (in which all data resides at one data center and individual devices do not generate local virtual-file representations of other devices' data).

55. The phrase "indistinguishable from the local files by the local file system" describes the functional result of this distributed architecture: virtual files integrated into each device's local file system such that the file system's own operations (list, open, read, write, metadata queries) have no need to differentiate them from locally originated files. This is an architectural statement about file-system equivalence. In other words, a POSITA would understand the amendment to mean integrating metadata … to generate virtual files stored in the same locations as local files of the local file system *which results in* the virtual files being indistinguishable from the local files by a local file system.

56. The amendment operates as a whole to address the objection. A POSITA would understand the entire phrase to mean a single step of the process. The last part of the amendment regarding "indistinguishability" was not related to a different objection or aspect of the prior art than the first part of the amendment. The last part was a functional result of the first part and was added to overcome the examiner's architectural objection.

57. Within a software program, "distinguishing" between data objects refers to programmatic identification through unique keys, identifiers, metadata, or other machine-readable values. For example, in Ben-Shaul a data center "distinguishes" a virtual disk 112a from virtual disk 112b by reading a metadata field, not by displaying a visual marker.

58. As I explained in my prior declaration (Dkt. 101-2, ¶¶ 52-58), the concept of "indistinguishability" in the context of file systems relates to foundational computer science principles of information hiding, encapsulation, and abstraction—mechanisms by which one software or system

component interacts with another through a common interface without knowledge of the underlying implementation. A POSITA would understand in the context of the amendment addressing the Ben-Shaul reference, the applicant added "indistinguishability" to describe this type of architectural transparency, not as a statement about visual presentation to human users.

59. The applicants' prosecution remarks contain no discussion of visual icons, graphics, pictures, user-facing displays, visual status indicators, or any other mechanism by which files in Vesper, Wills, or Ben-Shaul would have different visual appearances or be rendered in a user interface in a way that would make them visually distinguishable. A POSITA reading those remarks would not understand the amendment as addressing or surrendering systems where virtual files bear cosmetic visual markers such as sync-status icon overlays.

60. The applicants' remarks focused exclusively on architecture. The applicants stated that Ben-Shaul stores all virtual personal disks "in a single data center" and does not disclose or suggest distributing the virtual personal disks to other computing devices. *Id.*, at EM_0000347. The applicants then contrasted this with the claimed invention, where "metadata from the meta-indices of each of the other multiple devices" is integrated "into the local file system of each of the multiple devices to generate virtual files stored in the same locations as local files of the local file system." *Id.* The entirety of this distinction is architectural: centralized data-storage vs. distributed local-device integration. There is no mention of icons, visual indicators, status markers, or any user-friendly display mechanism.

**<u>The Amendment Bears No More Than a Tangential Relationship to the Alleged Equivalent of Visual File Icons</u>**

61. As I understand the record, Dropbox's accused equivalents are: (1) an online-only file differentiated to the user from a local file by a file status icon (green checkmark overlay); and (2) an online-only file differentiated to the local file system by a hydration node (reparse point) but eventually accessed as if it were a local file. My focus of this declaration is only on the former.

62. A visual file status icon is a cosmetic UI element that provides information to the user about the file's sync state. It does not alter how the local file system treats, stores, indexes, or operates on the file. The file system does not read, process, or respond to the icon overlay.

63. In my opinion, a visual file icon does not have any relationship to the centralized-versus-

distributed architecture that the amendment addressed. Visual file icons are orthogonal to the nature of the system architecture (centralized or distributed). Visual file icons are not related to whether the system uses centralized storage (like Ben-Shaul) or distributed local integration (like the ’338 Patent). One could modify the visual file icons without altering the underlying system architecture.

64. Dropbox’s system achieves the same local-file-system integration that the amendment was directed to: each device’s file system contains virtual file objects created using metadata from each of the other devices, placed in the same directory locations as local files, and processed by the file system through the same operations. The visual file icons are additions to that architecture, not alternatives to it.

65. Accordingly, in my opinion, a POSITA would understand that the rationale for the “indistinguishable” amendment (distinguishing centralized from distributed architecture) bears no more than a tangential relation to the accused equivalents of visual file icons. These equivalents exist on a different technical axis than the distinction drawn during prosecution.

66. The prior art itself confirms that distributed file sharing can be achieved without visual status markers. Vesper which was cited in the same rejection that prompted the amendment, describes a cloud-based system for distributing medical imaging records through a peer-to-peer network with centrally managed routing, caching, event-driven transfers, and authenticated web services. Vesper’s system distributes contents across nodes without employing placeholders, hydration mechanisms, reparse points, or status icons to distinguish local from remote files. Instead, Vesper relies on application-layer viewers, dynamically generated schemas, and web-compatible transcoding to present distributed content to users. This further confirms that the architectural distinction the applicants drew was not related to whether a system uses visual markers to indicate file status.

**Foreseeability of the Accused Equivalents**

67. Given my factual findings and opinions above, that the art that was cited by the examiner did not relate to visual file icons, nor was the rationale for the amendment related to visual file icons, it was not foreseeable that the amendment to claim 1 would surrender visual file icons.

68. Accordingly, in my opinion, the specific accused equivalents were not foreseeable to a POSITA at the time of the July 2012 amendment with respect to the scope of claim 1 of the ’338 Patent.

**CONCLUSION**

69. For the foregoing reasons, it is my opinion that: (1) Ben-Shaul's "images" and "identifiers" are backend technical concepts relating to disk-image storage and machine-readable metadata, unrelated to visual file icons presented to users; (2) the objectively apparent reason for the July 2012 amendment adding the "indistinguishable" limitation was architectural: to distinguish the claimed distributed-metadata system from Ben-Shaul's centralized architecture; (3) the amendment's rationale bears no more than a tangential relationship to the accused equivalents (visual file icons), as visual file icons are implementation details that do not implicate the centralized-versus-distributed distinction drawn during prosecution; and (4) it was not foreseeable that the amendment to claim 1 would surrender claim scope regarding visual file icons.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on August 31, 2026, in Los Angeles, California.

George Edwards

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on August 31, 2026 to all counsel of record via the Court's CM/ECF system.

By: /s/ *John E. Lord*
John Lord